DANIELS *v.* BAY CITY TRACTION & ELECTRIC CO.

143   493
s153   96

143   493
155   254
155   256

1. RECEIVERS — STREET RAILROADS — LIABILITIES FOR INJURIES— PURCHASERS AT SALE.

> A decree for a receiver's sale of a railroad provided that the purchaser should take subject to the payment of all claims for damages against the receivers, and should discharge all claims filed previously or within four months after entry of the decree, but only when and as the court should allow the claims. *Held*, that the limitation as to the filing of claims within four months did not refer to undetermined claims against the railroad for damages pending or arising within the period limited.

2. STREET RAILROADS—OPERATION—RIGHTS IN STREET.

> A street railroad has the right of way, and under ordinary circumstances it is the duty of other travelers using the tracks to yield them to the cars upon their approach.

3. SAME—INJURIES TO PERSON ON TRACK—CONTRIBUTORY NEGLIGENCE.

> One who drove upon a street-railroad track ahead of a car at a time when, if he had looked, he would have seen that he could not get across in time to escape the car, and who knew that the car was behind him and traveling at a high rate of speed, was guilty of contributory negligence.

4. SAME—DISCOVERED PERIL—QUESTION FOR JURY.

> In an action for injuries to plaintiff in a collision between his vehicle and a street car, evidence examined, and *held*, that the question whether the motorman could have avoided the collision by the exercise of reasonable care after discovering plaintiff's negligence was for the jury. GRANT and HOOKER, JJ., dissenting in part.

Error to Bay, Shepard, J. Submitted December 8, 1905. (Docket No. 180.) Decided March 27, 1906.

Case by William D. Daniels against the Bay City Traction & Electric Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Reversed.

*T. A. E. & J. C. Weadock*, for appellant.

*John Brigham* (*De Vere Hall*, of counsel), for appellee.

BLAIR, J. The Philadelphia Securities Company, trustee, filed its bill in the circuit court of the United States for the eastern district of Michigan, northern division, to foreclose certain mortgages made by the Bay Cities Consolidated Railway Company, and receivers were appointed, who were authorized to operate the railway. On July 20, 1903, a decree was made in said cause, directing the sale of the property subject to the payment of current costs and expenses of operating the property, and subject also to the payment of any and all claims for damages and taxes against the receivers, and providing that the purchaser or purchasers of said property shall assume all contracts and obligations of the receivers, excepting only such as are to be paid out of the purchase price, and shall pay and discharge all receivers' indebtedness and liabilities and any and all claims heretofore filed in this cause or that may hereafter be filed, within four months from the date of entering this decree, but only when and as the court shall allow such claims, and allow the same to be liens prior to the mortgages foreclosed.

"It is further ordered, adjudged, and decreed that as soon as the special master shall have reported upon the sale of said property, and such report shall have been confirmed by this court, the said special master shall make, execute, and deliver to the purchaser or purchasers a conveyance thereof, and the said Bay Cities Consolidated Railway Company, at the time of the execution of such conveyance by said special master, as a further assurance to the purchaser or purchasers, shall execute proper conveyances in like manner aforesaid, or join with the special master in the execution of the deeds or conveyance made by him, and shall thereby convey and release to the purchaser or purchasers all its right, title, and interest in and to all said railroad, franchises, and other property conveyed by said special master to such purchaser or purchasers; and the said Michael P. Heraty and John C. Weadock,

receivers, shall make and deliver a good and sufficient
conveyance to said purchaser or purchasers of all their
right, title, and interest in and to any and all property vested
in or standing in their names to which they have acquired
title as such receivers in the management or operation of
said property; and, further, that they pay over to the
said purchaser or purchasers, or to their successors or as-
signs, any and all surplus earnings and income of said
railroad that may be in their possession as such receivers
after having fully paid and discharged all debts and lia-
bilities incurred by them as receivers, and all money obli-
gations that may be imposed on them by order of this
court or otherwise."

On September 29, 1903, the special master sold the rail-
way, reported the sale on the same day, and it was ap-
proved on the following day, and the special master was
directed, upon receipt of the purchase money bid for the
property, viz., $500,000, to make, execute, and deliver to
the United Traction Company which was the purchaser,
a proper deed of conveyance.   The special master was
also required to publish, at least once a week for a period
of six weeks, a notice requiring the holder of any claims
against the Bay Cities Consolidated Railway Company or
said receivers to present the same for allowance on or be-
fore the 20th day of November, 1903, and any claims pre-
sented and allowed by the court to be liens prior to the
mortgage were required to be paid by the purchaser as
provided in the decree, and all claims not presented with-
in the time above limited should be absolutely barred.
No notice requiring presentation of claims was published
as ordered.   Attached to the order was the form of the
deed which he was required to execute, and this deed was
executed and delivered on the 1st day of December, 1903,
up to which date the receivers continued to operate the
property, making reports to the court, the first being made
on the 14th day of October and the last on the 1st day of
December.   This report covered receipts and disburse-
ments from the 30th day of September, 1903, to the 1st
day of December, 1903, showing a total of receipts during

such months, including $2,507.90 on hand on said 1st day of October, 1903, of $16,775.43, and a total of disbursements during such two months of $12,503.75, and a net cash balance on hand on the 1st day of December, 1903, of $4,271.68. Upon receipt of the final report on the 1st day of December, it was referred to the special master, and, on the 3d day of December, the report was approved and the receivers discharged. In the final report of the receivers, mention was made of the several actions then pending against them on account of claims for damages, and these claims were assumed by the purchaser, but no mention was made of the claim of the plaintiff herein. The United Traction Company was consolidated with the Traction & Power Company under Act No. 197 of the Public Acts of 1891 under the name of " Bay City Traction & Electric Company."

On October 29, 1903, during the time when the railway was being operated by the receivers, after it had been sold to the United Traction Company and before the United Traction Company had paid the purchase price, the plaintiff in this case was injured by colliding with one of the cars so operated by the said receivers. The injury was occasioned by reason of a collision between a delivery wagon, in which the plaintiff was driving, and a street car, which occurred on the westerly approach of the Third Street Bridge in West Bay City. The approach to the bridge is 36.39 feet in width, and for a distance of 158 feet there is, on either side, a stone coping, which rises to a height of 3 feet above the brick pavement. The railway has a track on either side of the approach. Some 38 feet east of the west end of the south retaining wall, the tracks begin to curve gradually towards the retaining walls, continuing the curve to point about 20 feet from the bridge, when they run directly east onto the bridge on either side near to the structural steel work. At the beginning of the curve the south rail of the south track is 10.79 feet from the retaining wall, while at the end of the curve the distance is narrowed to 7.5 feet. Just beyond the termi-

nus of the curve the coping angles sharply towards the structural steel work of the bridge until it is only some 2 feet and 4 inches from the south rail. At the beginning of the curve the two tracks are 6.72 feet apart, while at the end of the curve they are 12.63 feet apart. The plaintiff was driving from the west towards the east, having been in West Bay city for the purpose of making delivery of certain tinwork. The plaintiff is 76 years of age. He claims that when he came onto Midland street, which is the street leading to the bridge, at a point about 1,000 feet west of the bridge, he stopped and looked up the hill, which would be towards the west; did not see any car, and followed two big wagons that were driving easterly across the bridge on the south side. That after he crossed the Michigan Central Railroad Company's tracks a distance of about 100 feet, when he would be about 800 feet from the bridge, he heard the car coming across the Michigan Central tracks. He then urged his horse to a faster gait and kept on going until he got on that part of the approach between the retaining walls where the stone coping is, when he turned onto the track and the car hit the hind end of his wagon, sending the plaintiff ahead and throwing him onto the bridge. He was accustomed to driving horses all of his life. His hearing was slightly affected. He said, upon cross-examination, that he was in a hurry to get back. He knew the car behind him was going in the same direction as himself and at a faster rate of speed; that he kept as far away from the south rail of the track as he could until he came almost to the bridge, being clear of the track all of the time until he undertook to cross it and was hit. He knew the car was coming behind him when he turned, and knew that he could have stopped. He did not try to stop, but drove to get across as fast as he could.

" It was all done in a second. I knew the car was behind me, but I thought I had plenty of chance to get behind this other car because I hadn't room between the

track and the stone, and I thought if the motorman slowed down the least mite, I could get in the road."

The plaintiff's witness Clute saw him pass the window of his office, about 150 feet from the bridge, going very fast. The car was some 30 feet behind plaintiff at this point and going faster than plaintiff was.

" When I saw him, he was clear of the track, in a position where he was perfectly safe, if he stayed there. If he had slacked down or stopped, he was perfectly safe when I saw him."

Plaintiff testified:

" I heard the car coming over the cuts on the railroad, and I looked back and the car was coming pretty fast. Then I clicked up my horse and I caught up with two big wagons, right tight to them. I looked back once and saw the car. It was on the south track. I was driving for the bridge. I was on the pavement until I got up into where that big high stone coping is, and there wasn't room, and I thought then I was a little ahead of the car, may be as far as across this room, and I thought I would cut across, and there was a car going west on the bridge, on the north track, meeting these teams. As quick as the car got along so as I could get in behind them, I undertook to cut across. I turned the horse—I just got the horse turned like this, and he struck me in the hind end of my wagon and sent me way ahead of the horse. When I heard and saw the car coming behind and saw it coming fast, I didn't drive across on the other side of the street, for two reasons. One of the reasons, I met a farmer after I crossed the Michigan Central, and I met a number of farmers going west. That gave me the right of the road. Then I looked up and there was a car on north track about on the draw of the bridge going west. I dasn't drive across. The car was behind me; it was following me, about as far as across this room when I undertook to turn to get in the road. The two cars could not have met much from where the wagon laid. The wagon smashed right down. I didn't dare to stop on account there was no post to hitch to, and I didn't know but my horse might tear away from me. If he had tore away, he would have tore a good deal of other things to pieces. I should think he was 7 or 8 or 9 years old."

And again:

" *Q.* You were clear of the track, all the time, wasn't you ?

"*A.* I was until I crossed or undertook to cross up there by the approach.

" *Q.* Then you were clear of the track all the time until just when you got hit ?

"*A.* That is the nearest I was to the track.

" *Q.* You were away from the track so that you were safe all the time until just when you started to cross over and got hit—is that right ?

"*A.* I don't know, I think I was."

Plaintiff's witness Schmidz testified :

" I was sweeping and cleaning up the bridge from Clute's office to where it turns into the pickle factory. On the day of the accident, at the time of the accident, I was not on the bridge at all; that is, the part between the two retaining walls. I must have been west between four and five hundred feet, west of the retaining walls. Mr. Daniels was about up to that high curbing when the car passed me, Mr. Daniels was on the south side of the track, clear of the track, and clear of a car running along the track. He was safe as far as I seen him. I could see him until the car took him out of my sight. All I seen then was the horse. That is the last I seen. There was, I think, two wagons immediately ahead of him. He must have been 10 or 12 feet behind them before he turned, before he swung in the track. The way it looked to me, I could see the old gentleman would get hurt. I was under the impression that the wagons that were ahead of him kept on and went on ahead of him and on the bridge before the accident. I had an idea that the old man was going to be crushed or struck, I thought. I got that idea when I was watching him; when that rig went ahead of the car; the way he went ahead of the car. He was driving at a slow trot. There was nothing I saw to prevent him from stopping the horse. The other rigs kept clear. I think the car was going 11 miles an hour when it went by me, and it was going 11 miles an hour when the collision occurred."

Defendant's motorman testified :

" As I crossed the Michigan Central tracks on Midland street and from that time on until I came toward the bridge approach, I should judge I was going about 6 or

7 miles an hour. When I got a little more tnan midway from the bridge to the Michigan Central tracks, I saw Mr. Daniels — I should think about 100 or 150 feet ahead of me. I rang my rotary gong and continued on ringing it until I got to the bridge. It sounded loud. As I got near the bridge approach Mr. Daniels was in pretty close to the track, and I rang my gong and the rig swung out a little bit; then I turned my current on and increased the speed of the car. When I slowed down I guess I was going two or three miles an hour. I had the car under control. When he pulled over away from the track, he was near the west end of the stone coping. The horse was going along at a slow trot, not very fast, and as I came up, the horse slowed down. I don't know whether — he pulled him down, I guess. I was running slow, and I increased the speed of my car and started up on the bridge approach. I thought he was perfectly safe. As I approached the bridge, I got nearly up to the horse, right alongside, nearly passed within 20 feet of the corner of the coping when I saw the horse going by me. I then reversed the car and come to a stop, just as quick as I could bring the car to a stop. The front hub of the wagon struck the back of the corner post of the car, back of the post, and the right wheel struck the curbing of the bridge where it runs to make a grade to go up on the bridge. The old gentleman was thrown out on the road in front of the rig between the two south rails. He hung onto the lines. When the rig struck he was going so fast that the rig struck and stuck right in there solid and he went out on his head. I noticed him having hold of the lines as it struck. He went somewhere near the end of the shafts. The shafts remained attached to the wagon. * * * From the time I entered this coping I had the car under such control that I could stop it at any time within 25 feet.

"*Q.* About how far would you say it is from the south rail of the south track to the coping, at the point where you say the car passed Mr. Daniels?

"*A.* About seven feet and a half or eight feet.

"*Q.* And how far would you say it is right up where the angle is in the coping?

"*A.* About seven feet and a half.

"*Q.* Is that from the rail or from the car?

"*A.* From the rail.

" *Q.* How far would it be from the side of the car to the coping?

"*A.* It would be seven feet.

" *Q.* You think the car projects over half a foot?

"*A.* Eight inches."

At the close of plaintiff's case, counsel for defendant demurred to the evidence offered by plaintiff, and asked the court to direct a verdict in favor of the defendant, for the reasons:

"*First.* The defendant company was not operating the road at the time of the accident, and neither of the two companies, the consolidation of which resulted in the formation of the defendant company, were operating the property at the time of the accident.

"*Second.* For the reason that it had not been made to appear upon the part of the plaintiff that the defendant is in any way liable on account of anything that may have been done by the employés of the receivers of the Bay Cities Consolidated Railway Company.

" *Third.* For the reason that, under the testimony of the plaintiff and his witnesses, he turned in front of a moving car, which was in plain sight and within his hearing, and of the approach of which he had been warned and was aware, and the accident was the result of his own carelessness and negligence in that regard, and was contributed to by him."

Which motion was overruled, and exceptions taken. This is made the subject of the third assignment of error.

At the close of the case, defendant's counsel requested the court to charge the jury as follows:

" The plaintiff in this case has failed to prove that the defendant company, or either of the constituent companies, the consolidation of which resulted in the organization of the defendant company, was operating the road at the time of the accident, and it appears without dispute that the defendant company was not operating the road at the time and had nothing to do with the operation of the property until the 1st day of December, 1903. Therefore, your verdict must be for the defendant."

This is made the subject of defendant's fourth assignment of error.

The court was requested to charge the jury, among other things, as follows:

" The plaintiff in this case, under the testimony given by him and introduced upon his part, undertook to cross the track when, to his knowledge, a car was approaching from the west and within a few feet from him. That was negligence upon the part of the plaintiff, and, being guilty of negligence contributing to the accident, he cannot recover."

This is made the subject of defendant's fifth assignment of error.

We think the suit was maintainable against the defendant. The decree clearly requires that the purchaser shall take the property subject to the payment of "any and all claims for damages and taxes against the receivers." The provision for paying "any and all claims heretofore filed in this cause or that may hereafter be filed within four months from the date of entering this decree, but only when and as the court shall allow such claims and allow the same to be liens prior to the mortgages foreclosed in this consolidated cause," could not have been intended to refer to claims for damages pending or arising within the period limited and undetermined. The provision by its very terms relates to claims which were in such condition that they might be finally allowed by the court. It is manifest that if the plaintiff had presented his claim prior to November 20th, the court could not have allowed it. The amount of the claim, and whether there was any claim at all, was to be determined in the proper courts of the State. The order of September 30th must receive the same construction as the decree, and is limited by its terms to "any claims so presented and allowed by this court," etc. The final report of the receivers of December 2d mentions—

" Certain actions pending in the State courts on account of personal injury claimed to have been received by the plaintiffs in said actions or the plaintiffs' intestate therein, which, *so far as the same are undetermined, are as follows* [specifying five cases]. That the said United

Traction Company, as a part of said purchase, has assumed the defense of said actions and all liability on account thereof."

No reference is made in this report to any allowance of these undetermined claims by the court as liens prior to the mortgage, but, on the contrary, their assumption is referred to as part of the purchase price. We deem it certain that the filing of such claims was not required by the decree, and that the purchaser was thereby required to assume their defense.

The declaration contains two counts. The first count charges ordinary negligence on the part of defendant, and the second count charges gross negligence, as follows:

" And plaintiff avers that said United Traction Company then and there wantonly, recklessly, and willfully, violated its duty in that regard, and on, to wit, the day and year last aforesaid, and as plaintiff was traveling easterly on said Midland street at and near the approach to the bridge therein crossing the Saginaw river, seated in a vehicle drawn by a horse or horses, the said company and its said employés and agents in charge of one of its cars moving easterly on the southerly of its tracks, wantonly, recklessly, and willfully did run into and collide with plaintiff, thereby occasioning him serious injury, to his great damage as hereinafter set forth."

The court apparently submitted the case to the jury upon both theories, and defendant's seventh assignment of error challenges the accuracy of the court's charge to the jury, amongst other things, as follows:

" This is a peculiar and an exceptional case, and it is a case which presents a question of law as to the equal right of a traveler upon the highway and upon the tracks of a street railroad, in a strong light. The man had a right to approach the bridge in a careful and prudent way and go on. He is not obliged to stop and wait for someone behind him to go by, even though it be a street car. He has as good a right to drive up onto the bridge and onto the street car track to go onto the bridge as a street car behind him has to go on the same point for the same purpose, and if he does it in a careful and prudent way,

such as an ordinary careful and prudent man would drive under such circumstances in carrying on his business, and the street car comes up in a careless and reckless way, without controlling his car and not having it under control, and runs into him and injures him, the company is liable. I charge you further, if the plaintiff, driving up as he did into the coping in that narrow place, and the car approaching him behind, and the motorman saw that he was up in that narrow place within the coping, it was the duty of the motorman equally to put his car under control, and equally to guard lest an accident would happen in that narrow place and under those conditions, and he must exercise care, and the man driving the horse and wagon must exercise care to see that no accident happens. If the man was up in that place so far that it was dangerous and unsafe, and an accident might occur to him, it might be a question of judgment with him, whether or not he had best stay there or best attempt to get out by getting across ahead of the car. If he acted in the safest way that appeared to him that he ought to act in getting out of the dilemma, or the situation, and in so doing he went ahead of the car—if he acted in what he believed to be the best and most prudent way for him to act, and he was hurt, the defendant would be liable, because he had a right to act, under the circumstances, if he was in a dangerous place, considering his horse and his knowledge of it and his knowledge of the conditions, and the fear of being thrown into the coping or retaining wall or the horse going over it, or his rig going over it with him, he must act on the circumstances as they appear to him, and the motorman, in operating his car, must know, as a careful, prudent man, and considering those same things that are liable to happen. If he was up in there so far that there was danger of an accident, and the motorman coming up behind and seeing the situation, and seeing it involved a danger of injury to him, it was the duty of the motorman to stop the car, tell him to get out of there, drive on, get out of that place, if there was danger of an accident."

We think this charge was not justified by the circumstances of the case. While it is true that the street railway companies do not have an exclusive right to that portion of the highway covered by their tracks, they do have the right of way, and, under ordinary circumstances, it is the duty of other travelers using the tracks to yield

them to the cars upon their approach. Furthermore, the plaintiff was not driving upon the track ahead of the car; he was driving alongside of the track, and, for the greater portion of the time, in a place of safety, until he suddenly turned onto the track immediately ahead of the car. His right to use the track in such a case affords no greater protection than would be afforded in case of an attempt to cross at a highway crossing ahead of an approaching car. Neither did the fact that he was in a place of danger relieve him from the charge of negligence. He had negligently placed himself in a dangerous position, and, in such case, the danger cannot excuse negligence. He knew that the car was behind him for a considerable distance and "was coming pretty fast." It was only 30 feet behind him when he came to the coping. He knew the space between the coping and the track as well as the motorman did, and it was as much his duty to keep track of the car as it was of the carmen to keep track of him. If he had looked before he turned onto the track, he would have seen that he could not get across in time to escape the car.

He was clearly guilty of contributory negligence, and was not entitled to recover, unless defendant could have avoided the collision by the exercise of reasonable care after discovering his negligence. The plaintiff should have stopped his horse where there was room for the car to pass, but he did not stop, and it was a question for the jury whether, under all the circumstances, it was not apparent to the motorman that he did not intend to stop. The whole scene was spread out before the motorman; the approaching west-bound car; the two large wagons ahead of plaintiff; the narrowing space between the track and the coping finally diminishing to a little over two feet at the bridge; the overhang of his car; the necessity for plaintiff to avoid striking the coping and whether he was not evidently striving to beat the car to the bridge. If the motorman's version of the occurrence was correct, the plaintiff was not entitled to recover; but this presented a

question of fact for the jury, and we cannot say, as a matter of law, that there was no evidence to justify a conclusion that the subsequent negligence of the motorman was the proximate cause of the injury.  *Montgomery* v. *Railway Co.*, 103 Mich. 46 (29 L. R. A. 287).

The judgment is reversed, and a new trial ordered.

McALVAY and MOORE, JJ., concurred with BLAIR, J.

GRANT, J.  I concur in the opinion of my brother BLAIR, except upon one point.  I do not think the case is one for the application of the doctrine of discovered negligence; i. e., negligence on the part of the motorman after discovering that the plaintiff was in a dangerous position on account of his own negligence.  Plaintiff, under his own testimony, was in no position of danger until he suddenly turned across the track, when the car was but a few feet behind him.  The whole thing happened almost instantly.  I do not think there is any evidence to show that the motorman did not do all within his power to avoid the accident when he saw the plaintiff turn his horse directly across the track.  If there is any room for the application of the doctrine of discovered negligence, it must be because it was the duty of the motorman to anticipate that, because the plaintiff had driven into a narrow space, he (the motorman) must anticipate that he was liable to turn across the track.  I regard it as settled by the decisions of this court that it was plaintiff's duty, knowing the proximity of the car, that it was approaching, and that it could not turn out, to stop before putting himself in a place of danger, and let the car pass.  This court said, in *Rascher* v. *Railway Co.*, 90 Mich. 413, speaking through Chief Justice MORSE: "Street cars have precedence, necessarily, in the portion of the way designated for their use."  It was there also said that "this superior right must be exercised with proper caution and due regard for the rights of others."

Plaintiff could not deliberately place himself in the narrow space between the track and the curb, knowing that

the car was coming close behind him, and then invoke the doctrine that he was in a place of danger and had the right to act upon the spur of the moment as it seemed to him best to secure his safety. We held, in *Redson* v. *Railroad Co.*, 120 Mich. 671, that, where plaintiff was guilty of gross negligence in leaving his team upon the track in front of an approaching train, he could not be permitted to recover upon the theory that the engineer, knowing the danger, willfully ran them down, where there was no proof to contradict the engineer's testimony that he acted with proper caution as soon as the situation became apparent to him. Although that was a case of a steam railroad, I think the rule there established is equally applicable to this case. If, however, the question was one for the jury, I think the court should have given the following request:

"The drivers of wagons have the same right upon the approach as has the railroad company. Each must go and come with due regard to the rights of others. It is well known that a street car cannot turn out; that it cannot stop readily and quickly; and persons in going on or across a street railway track must make sure that no car is approaching within such a distance that the person operating the car will be unable to stop it so as to avoid an accident. And if you find from the evidence in this case that, at the time the plaintiff undertook to cross the street railway track, if he did undertake to do so, a car was so close to him that the operatives of the car could not, with the use of the means at their command, stop the car in time to prevent an accident, then your verdict must be for the defendant."

HOOKER, J., concurred with GRANT, J.